## Castleman-Blakemore Company v. Brucker.

(Decided December 10, 1915.)

### Appeal from Jefferson Circuit Court (Chancery No. 2).

2. Pleading—Misjoinder—Waiver.—A defendant waives his right to object to a misjoinder of causes of action by failing to make a motion to require plaintiff to elect.

2. Evidence—Admission by Corporate Officer—Admissibility.—The statement of the secretary and treasurer of a corporation, not a part of the res gestae, but made several months after the transaction was completed, to the effect that the only surplus the company had was good will, is not admissible against the company.

3. Corporations—Sale of Stock—Fraudulent Representations—Evidence—Sufficiency.—On a suit to set aside the sale of stock on the ground that the company fraudulently represented to the purchaser that it had a surplus of eighty-four or eighty-nine thousand dollars, a statement issued by the company that its surplus was only fifty-four thousand dollars is sufficient evidence that the representations were fraudulent when considered in connection with the fact that five hundred thousand dollars of the company's assets consisted of good will, brands and established trade.

4. Corporations—Sale of Stock—Fraudulent Representations—Reliance Thereon—Evidence.—In a suit by a purchaser to set aside a

sale of corporate stock on the ground that he relied on false representations with respect to the surplus of the company, made by its officers, evidence considered and held to show that the purchaser did rely on such representations in making the purchase and that he was entitled to have the sale set aside, although in making the purchase he was given employment by the company and the stock was personally guaranteed by its officers.

5. Corporations—Sale of Stock—Rescission—Ratification—Laches—Evidence.—In an action for rescission for the sale of corporate stock, evidence considered and held not to show that plaintiff, with knowledge of the condition of the company's affairs, either ratified his purchase or was guilty of laches in failing promptly to bring his suit for rescission.

6. Corporations—Sale of Stock—Rescission—Estoppel.—A purchaser of corporate stock is not estopped to rescind his sale because subsequent to the purchase others bought a controlling interest in the company, in the absence of evidence conducing to show that they were misled to their prejudice by some conduct on the part of plaintiff.

TRABUE, DOOLAN & COX and DAVID R. CASTLEMAN for appellant.

ARCHIBALD YOUNG for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Defendant was first incorporated December 18th, 1909, as Jones Bros., Castleman & Blakemore. On May 31st, 1911, Frank J. Brucker was employed by defendant as city salesman at a salary of $150 per month and traveling expenses. The contract, which was in writing, and was signed by Jones Bros., Castleman & Blakemore, by G. C. Jones, President, and by plaintiff, further provided that when H. E. Young, who was working the wholesale retail trade, severed his connection with the company, plaintiff was to represent the company in the same capacity. Simultaneously with his employment, plaintiff subscribed for $5,000 worth of the company's preferred stock, for which he executed his notes. At the same time the following agreement was entered into:

"Louisville, Ky., May Thirty-one, 1911.
"Mr. Frank H. Brucker,
          Present.

"Dear Sir:

"Confirming our verbal understanding with you whereby you are to enter the services of Jones Bros., Castleman & Blakemore, in the capacity of salesman in

the city trade of Louisville, and also whereby you purchase $5,000 worth of Jones Bros., Castleman & Blakemore's preferred stock, it is understood and agreed that in the event that Jones Bros., Castleman & Blakemore or successors for any cause dispense with your services as city salesman, it is agreed and understood that we, the undersigned, are to either purchase outright this stock at par, or we will find you a purchaser for same in a reasonable length of time.

"Yours very truly
(Signed)   GIDEON C. JONES,
CHAS. W. JONES.

"G. C. J.: Ram.

"I have carefully read the above, and hereby accept same."

At the time of the above transaction the following were the officers of the company:

Gideon C. Jones, President.

Chas. W. Jones, Treasurer.

Sam P. Jones, 2nd Vice President.

Henry E. Young, 3rd Vice President.

In December, 1911, or January, 1912, Jones Bros. disposed of their stock, principally to outside parties, and the corporation was reorganized and its name changed to Castleman-Blakemore Company. When this occurred plaintiff had not paid for his stock.

On December 4th, 1913, plaintiff brought this suit against the Castleman-Blakemore Company in two paragraphs. In the first paragraph he pleads that the above agreement between him and Gideon C. Jones and Chas. W. Jones was made by Jones Bros. on behalf of the company; that on or about the first day of May, 1913, the defendant took away from plaintiff the privilege of selling its products to the wholesale trade in Louisville, and that, by reason of defendant's failure and refusal to perform its contract, plaintiff was entitled to recover of defendant the $3,500 which he paid on the stock, and have his note for $1,500, the balance of the subscription price, cancelled.

In paragraph II. he pleads, in substance, that he was induced to purchase the stock by the false representations of the former officers of the company with reference to the financial condition of the company. He further alleges that the preferred stock which he purchased was not worth more than 50% of its par value.

The petition concludes with a prayer asking that the certificate of stock and his note for $1,500 be cancelled, and that he recover of defendant the sum of $3,500 and interest from May 31st, 1911, until paid; for his costs and for all just and proper relief.

The answer is in three paragraphs. The first paragraph is responsive to paragraph 1 of the petition and traverses certain of its allegation. It also pleads, in substance, that the contract sued on was the personal obligation of the Messrs. Jones and not the obligation of the company.

The second paragraph of the answer traverses the allegations of paragraph II. of the petition.

The third paragraph of the answer, after setting out plaintiff's employment, alleges, in substance, that defendant had complied with the terms of its contract. It further alleges that plaintiff, since his purchase, had been cognizant of defendant's financial condition, and with such knowledge he had repeatedly ratified and confirmed the purchase of his stock by making payments thereon after he acquired such knowledge, and that he was thereby estopped from repudiating the purchase.

On the final hearing the chancellor adjudged the cancellation of the stock and of plaintiff's note. for $1,500, which had been executed in part payment thereof, and further adjudged that plaintiff recover of the defendant the sum of $3,500, with interest from the date of the filing of the petition. Defendant appeals.

Briefly stated, the facts developed by the record are as follows: Plaintiff had been in the employ of C. C. Bickel & Company for many years and had saved about $5,000. A few months prior to his employment by defendant, H. E. Young, defendant's vice president, approached him with a proposition to buy some of defendant's preferred stock. In May, 1911, Gideon C. Jones, the president of the company, sent Young to plaintiff with the information that Young was going to leave defendant's employ and that arrangements could be made to give plaintiff his position. Plaintiff then went to the defendant's office, the terms of employment were agreed on, and the two contracts above referred to signed. Not having had much experience in executing contracts, he did not know that the contract which he made with the company, in regard to paying for, or finding a purchaser for, his stock, in the event of his dismissal from defend-

ant's services, was signed by the Jones Bros. as individuals instead of officers of the company. Before executing the contract of employment the president, and Young, the vice president, represented to plaintiff that the company was in a flourishing financial condition; that it had a surplus over and above its capital stock and liabilities of $84,000 or $89,000. Relying on these representations, he subscribed for and gave his notes for $5,000. He further claims that he was induced to make payments on his subscription on the representation that the bringing in of new directors had greatly strengthened the company. He also says that he did not learn of the fraud that had been practiced upon him until the middle of 1913, whereupon he immediately demanded his money and the cancellation of his stock and notes. At the same time defendant took away from him the privilege of selling certain portions of its merchandise and tried to induce him to accept a commission only on the residue of the merchandise to be sold. When the company refused to keep him on his regular salary, he declined to accept any change in his contract and demanded his money and the cancellation of his stock and notes. H. E. Young, former vice president, testified that he negotiated the sale of the stock to plaintiff. In making the sale he told plaintiff that defendant was in a prosperous financial condition and had a surplus of $84,000 or $89,000. This information he had received from the president of the company. He supposed the surplus was in dollars and cents, or in western plant—he didn't know which—but rather inferred that it was in dollars and cents. Some time thereafter he received an inquiry as to why dividends had not been paid. He referred the matter to Mr. Munn, the secretary and treasurer of the company. Mr. Munn stated to him that there wasn't any surplus other than good will. After that time he thinks he advised plaintiff of the information which he received from Munn. R. Norton Gray, a former bookkeeper for defendant, and who was with defendant when plaintiff was employed, stated that he could not remember, without reference to the books, the condition of the business at the time. However, he did not recall any surplus. He did not like to make a statement in regard to the business without having the books before him. From memory he could not state that the business was making money. While working there the general offices of the company

were enclosed by a railing. Mr. Munn made a rule that no salesman, foreman or superintendent should come behind the railing. This was not done to conceal anything from people entitled to know the condition of affairs, but was done for mere convenience. When Mr. Brucker asked for information in regard to the condition of the company, witness would either evade his answer or suggest that he ask Mr. Munn or Mr. Blakemore. S. E. Brannon, a former bookkeeper, testified that the company in May and June, 1911, were doing a nice business, but were hard up at that time. He thinks that when he left the company there was a surplus on the books, but did not recall what it consisted of. By agreement of the parties, a statement purporting to show the liabilities and assets of defendant on January 1st, 1911, was filed. This statement shows a surplus of $54,452.91.

For the defendant Mr. Blakemore testified to the organization and reorganization of the company. He further said that the condition of the company on May 31st, 1911, was substantially the same as that shown on the statement. Mr. Blakemore had nothing to do with getting up the statement; he was in charge of the preserving department and merely figured on the inventory in that department. On the question whether or not there was a surplus at the time plaintiff's contract was made, he made no statement.

Discussion of the improper misjoinder of the two causes of action set out in plaintiff's petition is rendered unnecessary by the fact that defendant failed, at the proper time, to make a motion to require plaintiff to elect, and thereby waived its right to object to the misjoinder. Section 86, Civil Code; Wilson v. Thompson, 1 Met., 123; Chiles v. Drake, 2 Met., 146; Bannon v. Bannon, 136 Ky., 556.

The chancellor properly held that no recovery could be had under the first paragraph of the petition. The contract sued on was the individual contract of the Messrs. Jones, and there was no allegation in the petition that the contract was intended as the obligation of the company, and that, by fraud or mistake, it was executed by them individually instead of on behalf of the company.

The next question is whether or not a recovery was proper under paragraph II. of the petition. In detailing the evidence we have purposely refrained from set-

ting out the representations as to the future prospects of the company, for the reason that they may not be taken into consideration in determining the question whether or not the sale was obtained by fraud. Yenawine v. Tycrete-Concrete Products Co., 160 Ky., 198. There is evidence to the effect that Young, who claims to have obtained the information from former officers of the company, represented to plaintiff that the company at the time of the sale had a surplus of $84,000 or $89,000. For the defendant it is argued that there was an absolute failure on the part of plaintiff to prove the falsity of this representation. It may be conceded that the evidence of Brannon and Gray throws but very little light on the subject. It may also be conceded that the chancellor erred in overruling defendant's exception to that part of Young's deposition, wherein he stated that several months after the purchase Munn, the secretary and treasurer of the company, remarked to him that the only surplus the company had was good will. This remark was not a part of the *res gestae,* but was made several months after the transaction was completed. The statement of Munn, therefore, was not admissible as evidence against the defendant. Stone v. Van Noy News Co., 154 Ky., 244; Duff Const. Co. v. Alford, 149 Ky., 594; Winchester, etc., Mfg. Co. v. Creary, 116 U. S., 161; Jones on Evidence, sec. 270, page 605. However, the company's own statement of January 1st, 1911, which one of defendant's officers says correctly represents the condition of the company at the time of the purchase of the stock, shows that the surplus of the company amounted only to $54,452.91. Even, therefore, if there be nothing else in the case than the discrepancy between the amount of the surplus represented to plaintiff and the amount shown by the statement, we think it is sufficiently material to show the falsity of the representations actually made. But defendant insists that as this statement shows that the stock was worth more than par and defendant paid only par for his stock, defendant has not been damaged and no ground for rescission is shown. We are not, however, disposed to adopt this view under the particular circumstances of this case. The statement itself shows that $500,000 of the capital stock of the company was "established trade." According to one of defendant's officers, it includes the "good will, brands and established trade." Manifestly, where so large a

part of the alleged assets of a company consists of such fluctuating assets as the good will, brands and established trade, the extent of the company's actual surplus plays an important part in determining the actual value of its assets. Considering the intangible and uncertain character of defendant's assets, a party might be willing to purchase the, company's stock if the surplus was $80,000 or $90,000, although he might refuse to do so if the surplus was only $50,000 or $55,000. We cannot, therefore, regard the difference between the surplus represented to plaintiff and that shown by the books as immaterial, although, on the face of the statement, the stock may be worth more than par, in view of the character of the assets shown by the statement and in view of the utter failure of any officer of the company to show that at the time of the transaction the company had the surplus represented by Young, or any surplus, or that the stock itself had any substantial market value. On the contrary, taking the statement alone, we think it sufficient to show the falsity of the representations made to plaintiff.

But defendant insists that plaintiff did not rely on the representations made by Young, but was induced to purchase the stock solely because he was promised a position with defendant, and Messrs. Jones personally guaranteed that the stock was worth what he paid for it. That the position and guarantee may have had considerable weight with him cannot be doubted, but he certainly had the right to rely, both on the guarantee of the position and the representations as to the value of the stock. He says that he relied on such representations, and we see nothing in the record to justify the conclusion that in purchasing the stock he relied solely on the guarantee and promise of the position.

The plea of estoppel is not available. The evidence fails to show that plaintiff, with knowledge of the condition of the company's affairs, either ratified his purchase or was guilty of laches in failing promptly to bring his suit for rescission. While it is true that after his purchase of the stock other stockholders bought a controlling interest in the company, it does not appear that they were misled to their prejudice by any conduct on the part of plaintiff.

Judgment affirmed.